UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ADVANCED WELDING, LLC,
    *Plaintiff*,

v.

LM INSURANCE CORPORATION,
    *Defendant*.

No. 3:18-cv-197 (JAM)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

In May 2016, an employee of plaintiff Advanced Welding, LLC, was very seriously injured on the job. About one year earlier, Advanced Welding had purchased a workers' compensation insurance policy from defendant LM Insurance Corporation. But LM Insurance cancelled the policy as of November 2015 because Advanced Welding had failed to cooperate with respect to an audit conducted by LM Insurance to ascertain the nature and risk level of work activities in which Advanced Welding's employees engaged.

Advanced Welding has now filed this lawsuit against LM Insurance, principally alleging that LM Insurance assured Advanced Welding that it would reinstate the policy and that it should be equitably estopped now from declining to reinstate the policy. LM Insurance has moved for summary judgment on the ground that there is no genuine fact issue to support Advanced Welding's argument for equitable estoppel. I agree and therefore will grant LM Insurance's motion for summary judgment.

### BACKGROUND

The following facts are drawn from the parties' summary judgment statements as submitted pursuant to D. Conn. L. R. 56(a). LM Insurance has submitted a detailed factual statement (Doc. #29-2) that has not been controverted by Advanced Welding's fact statement (Doc. #32-1) except to the extent that Advanced Welding has adduced additional facts in its

1

statement. Accordingly, I deem the facts as stated in LM Insurance's statement to be true, and the factual record before me is largely undisputed, notwithstanding Advanced Welding's statement of additional facts. *See* D. Conn. L. R. 56(a)(1) (properly supported facts alleged in movant's statement deemed admitted unless specifically controverted by non-movant's statement).

### *The parties and the workers' compensation insurance policy*

Advanced Welding is a Connecticut limited liability company. Doc. #29-2 at 1 (¶¶ 1-2). LM Insurance is a Massachusetts corporation, with its principal place of business in that state, and LM Insurance is authorized to issue workers' compensation policies in Connecticut. *Id*. at 2 (¶ 7).

The National Council on Compensation Insurance ("NCCI") is licensed by Connecticut and designated as the plan administrator of state's workers' compensation "assigned risk program." This program makes workers' compensation insurance available to those who cannot obtain it through the private market.[1] The NCCI also publishes rules and performance standards that govern the assigned risk program and is referred to as a "rating organization." Doc. #29-1 at 3, 22.

Employers seeking coverage through the state's assigned risk program file an application with the NCCI, which evaluates it and assigns the coverage obligation to an insurer authorized to issue workers' compensation policies in Connecticut. *See* Doc. #29-1 at 2-3. The NCCI application requires employers to identify the employees who would be covered under the workers' compensation policy and to specify the type of work in which employees engage. The

---

[1] *See* Doc. #29-1 at 3; *see also* State of Connecticut Insurance Department, Workers' Compensation, accessed Jan. 27, 2020, https://portal.ct.gov/CID/Property-and-Casualty/Workers-Compensation [https://perma.cc/5K7Z-DCAQ]; National Council on Compensation Insurance, NCCI State Map, accessed Jan. 27, 2020, https://www.ncci.com/Pages/AU_NCCIStateMap.aspx [https://perma.cc/GS4G-MGVV].

type of work in which an applicant's employees engage is highly relevant to determining the applicant's premium for workers' compensation insurance. For example, the workers' compensation rate for employees classified under code 5059 ("steel erectors") is $89.74 per $100 of remuneration, while the rate for employees classified under code 5535 ("sheet metal workers") is $0.72 per $100 of remuneration. *Id*. at 2 (¶ 6).

In May 2015, Advanced Welding applied through the NCCI for a workers' compensation policy. Doc. #29-2 at 1 (¶ 3). In its NCCI application, Advanced Welding described its operations as involving "Prefab Building Erection" and listed 10 full-time employees to be covered, specifying some as performing "sheet metal work," which has a lower-cost classification code of 5535. *Id*. at 1-2 (¶¶ 4-5). Based on the submitted employee classification codes, the estimated workers' compensation policy premium for Advanced Welding was $68,448. *Id*. at 2 (¶ 6).

After receiving Advanced Welding's application, NCCI assigned the coverage obligation to LM Insurance. *Ibid*. (¶ 7). In May 2015, LM Insurance issued a one-year workers' compensation policy to Advanced Welding on the basis of the application information that Advanced Welding had submitted to NCCI. *Ibid*. (¶ 10).

In a "Policyholder Information Packet" that accompanied the policy, LM Insurance advised Advanced Welding that an on-site audit might be conducted for the purpose of reviewing classifications of employees and payroll records. *Id*. at 3 (¶ 12). The NCCI rules obligate an employer to maintain detailed payroll records, and if an employer fails to do so, the highest applicable classification code is applied. *Id*. at 13 (¶ 34). LM Insurance further advised that if any requested information was not made available, Advanced Welding's premium might be altered or its policy cancelled. *Id*. at 3 (¶ 12).

*The efforts of LM Insurance to conduct an audit*

Shortly thereafter, LM Insurance commenced a Preliminary Physical Audit ("PPA") because some of Advanced Welding's employees had been classified under the low-cost code 5535 ("sheet metal work"). *Id*. at 5-7 (¶¶ 20-24). LM Insurance assigned the PPA to one of its auditors, Keshia White. *Id*. at 13 (¶ 35).

In July 2015, White contacted Advanced Welding about the PPA, and she was referred to Advanced Welding's insurance agent, Tracy Driscoll Co., Inc. *Id*. at 13-14 (¶¶ 35-45). In August 2015, White met with Robert McFadden of the Tracy Driscoll company to discuss the PPA and to obtain some needed documentation. *Id*. at 14 (¶¶ 44-45). White did not obtain all the required information before she submitted an initial Premium Audit Report on the PPA, in which she noted, "Test Audit Conducted as Consultation with insured [Advanced Welding] and insured has been informed o[f] documents needed to complete final audit." Doc. #29-9 at 7 (Ex. A); *see also* Doc. #29-2 at 14 (¶ 46).

In August 2015, White continued her efforts to complete the PPA of Advanced Welding. *Id*. at 14 (¶¶ 47-48). At White's request for additional information, Tracy Driscoll emailed White a "Payroll Summary," which purported to report the nature of each employee's job and the category for their pay, such as sales, clerical, or sheet metal. *Id*. at 15 (¶¶ 50-52). But Advanced Welding's Payroll Summary did not present the employees' work by classification code, as was required by LM Insurance and the NCCI guidelines. *Id*. at 15 (¶ 52).

In September 2015, White called, left a voicemail, and emailed Tracy Driscoll, stating that she still needed more information about Advanced Welding. *Ibid*. (¶ 53). In that email, White advised that because the Payroll Summary did not sufficiently detail the employees' work, "all the payroll would go to the highest rated code which will result in a large premium

4

increase," in accordance with NCCI rules. *Ibid*. (¶¶ 53-54). In light of this possible consequence, White went on to write, "I would like to visit you onsite so we can try to come up with a correct estimate looking over your previous contracts and work performed in the previous year." *Ibid*. (¶ 54).

The next day, Tracy Driscoll's McFadden responded to White's email, indicating that the Payroll Summary had already been submitted to White. *Id*. at 16 (¶ 55). White replied to reiterate that Advanced Welding's Payroll Summary did *not* provide the necessary information. As White explained by email, "When I say there is no separation of payroll, this is regarding the employees performing all operations including sheet metal install, sheet metal erection etc. Those specific employees' payroll [sic] are not split in the applicable categories of work and because he [Advanced Welding] said they perform a little bit of everything but is not keeping any separation of payroll all the payroll would go to the highest code." *Ibid*. (¶ 56). After Tracy Driscoll still failed to provide the needed information, White then sent a letter directly to Advanced Welding, informing Advanced Welding of the documentation requests and relaying her attempts to contact the company. *Id*. at 17 (¶ 60).

In October 2015, Tracy Driscoll's Marissa Sylvester responded to White, again indicating that Advanced Welding's Payroll Summary had already been provided, notwithstanding White's repeated explanations of the document's inadequacies. *Ibid*. (¶ 61).

On October 12, 2015, White completed a second Premium Audit Report for the PPA, in which she reported that, because Advanced Welding "was not able to provide a payroll break down by job, all payroll exposures other than bookkeeper were being classified to 5059," which corresponds to "steel erectors." *Ibid*. (¶ 63). White's report also identified other discrepancies in payroll records. *Id*. at 17-18 (¶ 64). The PPA of Advanced Welding was then terminated as a

"partial closeout" because White had still not been provided with the requested records. *Id*. at 18 (¶¶ 66-67). The change in the classification codes for Advanced Welding's employees, from 5535 ("sheet metal workers") to 5059 ("steel erectors"), resulted in an enormous increase in the policy premium, rising from $68,448 to $582,305. *Ibid*. (¶¶ 68-69).

### *The cancellation of Advanced Welding's insurance policy*

On October 22, 2015, LM Insurance issued a Notice of Cancellation of Insurance, which was received by Advanced Welding and its agent Tracy Driscoll. *Id*. at 18-19 (¶¶ 70, 73).[2] In the Notice of Cancellation, LM Insurance stated that Advanced Welding's policy was cancelled effective November 11, 2015 "due to your failure to comply with Plan underwriting rules and your failure to respond to our requests for additional information." *Id*. at 18-19 (¶ 71). The Notice of Cancellation further stated, "Once your policy is cancelled for any reason, you are not eligible for reinstatement or replacement coverage through the Plan until all eligibility requirements, including the requirements set forth above, have been satisfied." *Ibid*. In the Notice, LM Insurance then advised, "If your policy is cancelled, and you need workers compensation insurance, we recommend that you or your agent immediately seek to obtain coverage." *Ibid*.

LM Insurance then informed Advance Welding that it was cancelling the policy but that it would conduct a post-cancellation audit to determine whether Advanced Welding's policy premium for coverage up to the date of cancellation would need to be adjusted: "An audit of your exposure is necessary to determine the final premium for your policy. It may take up to 90

---

[2] The Notice of Cancellation was also electronically filed with the NCCI. Doc. #29-2 at 19 (¶ 74).

days for this audio to be completed and for us to calculate your final premium. This may result in additional premium being owed to us or a refund of excess premium to you." *Id*. at 21 (¶ 88).[3]

On November 10, 2015, Tracy Driscoll's McFadden called LM Insurance and spoke with customer service representative Laurie Stevens, requesting that the "Advanced Welding bill" be put on hold while he "pursued a dispute" regarding LM Insurance's audit results. *Id*. at 19-20 (¶ 79). Stevens told McFadden that LM Insurance had no notice or record of an open dispute with Advanced Welding. *Id*. at 20 (¶ 80). Neither Advanced Welding nor Tracy Driscoll provided written notice to NCCI that it was pursuing a dispute with LM Insurance. *Id*. at 20-21 (¶¶ 86-87).

### *The efforts of LM Insurance to conduct a cancellation audit*

White was assigned by LM Insurance to conduct the cancellation audit of Advanced Welding. *Id*. at 21-22 (¶ 89). But by early January 2016, White had still not received the documentation required to complete the audit. *Id*. at 24-25 (¶ 115). In her Premium Audit Report on the cancellation audit, White noted that "the insured [Advanced Welding] has not provided necessary documentation to eliminate the exposures under class code 5059. The insured was not able to provide any job contract that documented the type of work being performed. All payroll exposures other than bookkeeper have been classified to 5059 per NCCI rule." *Id*. at 25 (¶ 116). Thus, because Advanced Welding had still not provided requisite documentation to support its view that its employees should be classified under code 5535 rather than 5059, LM Insurance's

---

[3] LM Insurance's subsequent communications to Advanced Welding included language that the current "Audit Term" was "Cancellation" and that the letter was a "cancellation audit exhibit." Doc. #29-2 at 22 (¶¶ 94-95) (Dec. 9, 2015 letter to Advanced Welding); *id*. at 22-23 (¶¶ 97-99) (Jan. 6, 2016 letter to Advanced Welding). Later letters to Advanced Welding also stated that the policy had been cancelled. *Id*. at 23 (¶¶ 103-05) (letter of April 7, 2016, to Advanced Welding); *id* at 24 (¶¶ 109-11) (letter of April 21, 2016, to Advanced Welding).

cancellation audit was deemed a "partial closeout," which would need to be revised. *Ibid*. (¶¶ 117-18).

LM Insurance again assigned the "revision" of Advanced Welding's cancellation audit to White. *Ibid*. (¶ 118). As part of this effort, White eventually was able to obtain some additional information about Advanced Welding, albeit largely in the form of representations either from the company or from its insurance agent, Tracy Driscoll. *Id*. at 25, 30 (¶¶ 119, 150). For example, in March 2016 McFadden of Tracy Driscoll represented by email that the company did "no welding." *Id*. at 30 (¶ 151). On a conference call with White in April 2016, Advanced Welding made other representations regarding the limited nature of the work undertaken by its employees. *Id*. at 25 (¶ 120). After the call, Advanced Welding followed up by email, representing that "Advanced [W]elding is only responsible for Siding, Gutters, Windows, Pass doors and any mis trim [sic] that may be required to complete our portion of the job. The steel frame work is not by Adv. Welding but by another sub hired either by the owner or the general contractor on the job." *Id*. at 25-26 (¶¶121-22).

Later that month, LM Insurance decided to end White's cancellation audit efforts, largely on the basis of Advanced Welding's representations regarding the nature of its employees' work and even though Advanced Welding had still not provided the requested supporting documentation. *Id*. at 26 (¶ 123). Accordingly, White completed another Premium Audit Report on the cancellation audit, in which she noted the incomplete documentation but concluded that, based on Advanced Welding's representations, it appeared that "class code 5535 was applicable to the operations rather than 5059." *Id*. at 26-27 (¶¶ 124-26). Advanced Welding's final premium for the months that its LM Insurance policy was in effect was thus calculated to be $26,175. *Id*. at 27 (¶ 127).

8

On April 7, 2016, after completing this Premium Audit Report regarding the cancellation audit, White emailed LM Insurance's "Audit Ops IME," copying Tracy Driscoll's McFadden. In the email, White noted the change in Advanced Welding's employee classification codes to 5535 and wrote, "Can you please reinstate policy WC5-31S-610781-015 as the audit has been conducted, per the insured's request?" *Id*. at 27 (¶ 128).

After this email was forwarded to LM Insurance's underwriting department with a request for advice, McFadden replied, questioning the need for the request because, in his words, Advanced Welding simply "would like [its] policy reinstated with no lapse etc back to inception. This was a test audit." *Ibid*. (¶ 131); *see also* Doc. #29-9 at 83 (Ex. M). LM Insurance's Laurie Stevens responded to McFadden, explaining that the email had been forwarded to the underwriting department because that department handled cancellations, reinstatements, and rewrites, and she provided the telephone number for the underwriting department. Doc. #29-2 at 27-28 (¶ 133).

On April 21, 2016, LM Insurance issued its "final audit exhibit letter" to Advanced Welding, and separately advised that the company could reapply for coverage. *Id*. at 28 (¶ 134); *see also id*. at 24 (¶ 111) ("cancellation audit exhibit"). LM Insurance then returned $34,452 to Advanced Welding, retaining only the finalized premium of $26,175 for the months that the policy had been in effect. *Id*. at 28 (¶ 135); *see also id*. at 27 (¶ 127).

*Worker injury and claim*

In May 2016, Advanced Welding employee Gary Cyr was severely injured on the job. *Id*. at 28 (¶ 136); *see also* Doc. #15 at 3-4 (¶ 11).[4] Cyr submitted a claim for workers' compensation

---

[4] Notably, although Advanced Welding's Payroll Summary lists Cyr as a yard mechanic, showing his pay under the category "Hourly-Sales," and he was listed in White's final Premium Audit Report as a "sales employee," the state investigative report of Cyr's injury noted that he was injured "while working as a welding/steel worker, for Advanced Welding, LLC." Doc. #29-2 at 26-27, 31, 28 (¶¶ 126, 161-163, 141): *see also id*. at 30-31 (¶¶ 157-158)

9

benefits to LM Insurance, who denied it on the basis that it had cancelled Advanced Welding's policy as of November 2015. *Ibid*. (¶¶ 11-12).

In June 2016, McFadden of Tracy Driscoll sent a letter to LM Insurance, in which he disputed LM Insurance's refusal to reinstate Advanced Welding's policy. Doc. #29-2 at 32 (¶ 173). LM Insurance's Leonard Ficaro responded later that month, advising that, after his review of all relevant material, "the cancellation had been handled correctly and the policy could not be reinstated." *Id*. at 32-33 (¶¶ 174-75). Ficaro further advised that in the event of disagreement, Advanced Welding "should follow the dispute procedures outlined in the attached [NCCI rules] and escalate the dispute/request for reinstatement to the NCCI." *Id*. at 33 (¶ 176).

### *Request for review to the NCCI*

In August 2016, Tracy Driscoll's Janice Mauriello sent an email to the NCCI, in which she requested review of Advanced Welding's dispute with LM Insurance. *Ibid*. (¶ 177). Mauriello noted that Advanced Welding could have replaced its workers' compensation coverage after the November 2015 cancellation of its policy, but the company did not do so. *Ibid*. (¶¶ 177-178).

NCCI assigned the matter to one of its dispute consultants, Maureen Longanacre, who asked Mauriello to elaborate on what remedy Advanced Welding was seeking. *Id*. at 33, 34 (¶¶ 179, 182). In reply, Mauriello stated Advanced Welding was seeking reinstatement of the policy backdated to November 11, 2015. *Id*. at 34 (¶ 183).

In October 2016, Longanacre emailed Tracy Driscoll's Mauriello with her conclusions from the review, advising that she saw "nothing that violates a NCCI rule," and concluding "[i]t

---

(stating that Advanced Welding's payroll summary made no reference to steel framing). This is inconsistent with Advanced Welding's April 2016 representations to LM Insurance about the nature of its employees' work, such as that its employees did no welding or steel frame work, because Cyr was doing steel frame work at the time of his accident. *Id*. at 28-29 (¶¶ 146, 140, 142).

10

appears that the insured [Advanced Welding] did not provide all information to complete the interim audit until after the cancellation date." *Ibid*. (¶¶ 184-85). Ultimately, Longanacre concluded that neither NCCI nor LM Insurance was under any obligation to reinstate the policy, and NCCI could not direct LM Insurance to reinstate the policy. *Ibid*. (¶ 185). Neither Advanced Welding nor Tracy Driscoll sought review of this NCCI determination, either through a hearing or other proceeding with NCCI or with the Connecticut Insurance Commissioner. *Ibid*. (¶¶ 186-87).

### *Current action*

In February 2018, Advanced Welding filed this federal lawsuit. Doc. #1; *see also* Doc. #15 (amended complaint). The amended complaint alleges two claims against LM Insurance. In the first count, the company seeks a declaratory judgment pursuant to 28 U.S.C § 2201 "that LM Insurance is required to defend and/or indemnify Advanced Welding with respect to Cyr's pending workers' compensation claim." Doc. #15 at 4-5 (¶¶ 13-17). In the second count, entitled "Equitable Estoppel," Advanced Welding alleges that LM Insurance agreed to reinstate the policy, and that Advanced Welding "detrimental[ly] relied upon the assurance from LM [Insurance] that the [p]olicy would be reinstated in that Advanced Welding did not seek out replacement workers['] compensation insurance for its business which would have provided coverage for Cyr's May 17, 2016 accident." *Id*. at 5-6 (¶¶ 18-23). LM Insurance now moves for summary judgment. Doc. #29.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

11

law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

*Administrative exhaustion*

LM Insurance argues that Advanced Welding failed to exhaust its administrative remedies before filing this lawsuit. It relies on Connecticut General Statutes § 38a-678(a), which provides a review process by which a person may dispute the conduct of an insurer or rating organization such as the NCCI. First, a person aggrieved by a "rate charged, rating plan, rating system, or underwriting rule" may request that the insurer or the rating organization review the manner in which the rate, plan, system or rule has been applied. Should the insurer or the rating organization fail to act on the request, or if the filing party is still "aggrieved" after a decision is reached, then that person "may" file a complaint and request a hearing with the Connecticut Insurance Commissioner. Conn. Gen. Stat. § 38a-678(a). The Commissioner may issue a noncompliance notice or hold a public hearing if there is good cause to believe the insurer's noncompliance was willful or if the insurer fails to correct the noncompliance. Conn. Gen. Stat. §§ 38a-678(b), (c), (d).

According to LM Insurance, this lawsuit must be dismissed because Advanced Welding failed to properly avail itself of the administrative process and to seek review of the NCCI's

adverse decision by the Connecticut Insurance Commissioner before filing this action. I do not agree. Although section 38a-678 provides a procedure for administrative review, the statute does not say that a party must file a complaint with the Insurance Commissioner (the statute says a party "may" do so). Nor does the statute provide that the failure to do so precludes judicial review.

For this reason and others, the two Connecticut courts to address a similar argument that section 38a-678 imposes a mandatory exhaustion requirement have rejected it. *See Liberty Mut. Fire Ins. Co. v. iCare Health Mgmt., LLC*, 2016 WL 3085416, at *5-*10 (Conn. Super. Ct. 2016); *Liberty Mut. Ins. Co. v. A. Advance Relocation & Storage of Connecticut*, 1998 WL 310895, at *3-*4 (Conn. Super. Ct. 1998). The Second Circuit has otherwise ruled that a federal court may not dismiss a claim on grounds of failure to exhaust state law administrative remedies if state law does not make exhaustion a prerequisite for judicial review. *See Sprint PCS L.P. v. Connecticut Siting Council*, 222 F.3d 113, 116-17 (2d Cir. 2000). Accordingly, I conclude that Advanced Welding was not required to exhaust the administrative process set forth in Conn. Gen. Stat. § 38a-678 before filing this lawsuit to seek relief against LM Insurance.

### *Equitable estoppel*

As a preliminary matter, LM Insurance argues in its summary judgment motion that it properly cancelled the policy and that it was not obligated to reinstate the policy. Although much of Advanced Welding's amended complaint alleges that LM Insurance improperly cancelled the policy, Doc. #15 at 2-3, its summary judgment opposition defends solely on grounds that LM Insurance should be equitably estopped from refusing to retroactively reinstate the policy after it had been cancelled, Doc. #32 at 1, 15; *see also* Doc. #15 at 6 (¶¶ 21-23). Accordingly, I conclude that Advanced Welding has abandoned its declaratory judgment claim with respect to LM

Insurance's cancellation of the policy and the focus of this ruling will be whether there is a genuine fact issue supporting Advanced Welding's claim that LM Insurance should be equitably estopped from refusing to retroactively reinstate the policy.

There is good reason to doubt that Connecticut law even recognizes a cause of action for equitable estoppel, as distinct from a claim for promissory estoppel. *See, e.g.*, *Vasily v. MONY Life Ins. Co. of Am.*, 104 F. Supp. 3d 207, 221 (D. Conn. 2015); *Known Litig. Holdings, LLC v. Navigators Ins. Co.*, 934 F. Supp. 2d 409, 420-21 (D. Conn. 2013). But because LM Insurance does not raise this argument, I will presume that it does and I will address the merits of Advanced Welding's equitable estoppel claim.

In general, the doctrine of "equitable estoppel is concerned with actions by one party that induce a faulty reliance by the other party." *Celentano v. Oaks Condo. Ass'n*, 265 Conn. 579, 615 (2003). Under Connecticut law, to invoke the doctrine of equitable estoppel, two essential elements must be proved: (1) the opposing party "must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief," and (2) the complaining party in reliance "must actually change his position or do some act to his injury which he otherwise would not have done." *Russo v. City of Waterbury*, 304 Conn. 710, 735 (2012).[5]

Even viewing the record in the light most favorable to Advanced Welding, I conclude that there is no genuine fact issue to show that LM Insurance (or its auditor White) said or did anything that was intended or calculated to induce Advanced Welding to believe that LM

---

[5] Similarly, a claim for promissory estoppel claim requires proof of a "clear and definite promise which a promisor could reasonably have expected to induce reliance." *TD Bank, N.A. v. Salce*, 175 Conn. App. 757, 766 (2017). Even assuming that Advanced Welding's complaint alleged a claim for promissory estoppel, I would conclude that the evidence is insufficient to create a genuine fact issue on such a claim for the same reasons that I conclude the evidence here does not create a genuine fact issue to support a claim for equitable estoppel.

Insurance would reinstate the policy. After Advanced Welding failed to cooperate with LM Insurance's audit, LM Insurance issued a notice of cancellation on October 22, 2015. Doc. #29-2 at 18 (¶ 70). This notice specifically advised Advanced Welding that "[o]nce your policy is cancelled for any reason, you are not eligible for reinstatement or replacement coverage through the Plan until all eligibility requirements, including the requirements set forth above, have been satisfied." *Id.* at 18-19 (¶ 71). And it told Advanced Welding that, if "you need workers compensation insurance, we recommend that you or your agent immediately seek to obtain coverage." *Ibid*.

It is undisputed that at no time after the issuance of this notice of cancellation did LM Insurance issue a letter or take any other action rescinding the cancellation, reinstating the policy, or representing to anyone that it was going to rescind the cancellation or reinstate the policy. *Id.* at 19 (¶¶ 75-78).[6]

To be sure, there were subsequent communications between the parties (and between their agents) concerning the policy cancellation. For example, Tracy Driscoll's McFadden asked Laurie Stevens at LM Insurance that the "Advanced Welding bill be put on hold while he pursued a dispute with LM Insurance regarding the results of the audit." *Id.* at 19-20 (¶ 79). But the fact that McFadden requested relief does not establish without more that LM Insurance in turn engaged in any action to induce Advanced Welding into believing that the policy would be reinstated.

Advanced Welding focuses on the statements and acts of LM Insurance's Keshia White, whose role it was to conduct the audit that led to the policy cancellation and then the post-

---

[6] These facts are drawn directly from LM Insurance's Local Rule 56(a)(1) statement of material facts, and—as noted above—Advanced Welding has failed to file a local rule statement that controverts any of the specific facts stated in LM Insurance's local rule statement, such that I deem these statements to be undisputed and true for purposes of this motion. *See* D. Conn. L. Civ. R. 56(a)(1).

15

cancellation audit. Advanced Welding argues that because White had apparent authority to reinstate the policy, LM Insurance should be estopped from denying reinstatement. Doc. #32 at 13-14. But even assuming that Advanced Welding could show that White had apparent authority to bind LM Insurance with respect to a reinstatement of the policy, Advanced Welding still does not point to any statement or assurance of White in which she promised or did or said anything intended to induce Advanced Welding that the policy would be reinstated.

It is true that White sent an email to LM Insurance on April 7, 2016, which was copied to McFadden and which requested reinstatement "per the insured's request." *Id.* at 27 (¶ 128); *see also* Doc. #29-9 at 84 (Ex. M). But there is no evidence to show that this email was intended or calculated to induce reliance on Advanced Welding's part or that Advanced Welding could reasonably have believed that this request for reinstatement entitled it to reinstatement. To the contrary, McFadden followed up two days later on April 9, 2016, with an email to LM Insurance stating that he had been "working closely with Keisha [White]" and that he was "aware of [the] *request* to reinstate" and that "[w]e would like [the] policy reinstated with no lapse etc back to inception." *Id*. at 83 (emphasis added). This email demonstrates McFadden's knowledge simply that LM Insurance had received a request for reinstatement, not that LM Insurance had made a promise or assurance of reinstatement.

Two days later on April 11, 2016, McFadden received a reply email from Laurie Stevens of LM Insurance advising that his email had been "forwarded to the underwriting department for review, as they handle cancellation, reinstatements, and rewrites." *Ibid.* McFadden testified in his deposition that he read this email and knew that "it was up to somebody in the underwriting department" whether the policy would be reinstated. Doc. #32-5 at 21. This additional evidence shows again that, at most, there was no more than a request for reinstatement and that Advanced

16

Welding was told that the request for reinstatement would be reviewed by the underwriting department without any additional assurance or promise from LM Insurance that the reinstatement would be granted.

Ten days later on April 21, 2016, LM Insurance advised Advanced Welding again that it could reapply for coverage, and it also disbursed a partial premium refund of $34,452, consistent with its early termination of the policy as of November 11, 2015. Doc. #29-2 at 28 (¶¶ 134-35). These additional actions further negate any genuine fact issue to suggest that LM Insurance made any statements or engaged in any other conduct that was intended or calculated to induce Advanced Welding to believe that the policy would be reinstated.

Advanced Welding additionally argues that LM Insurance should have told it that certain NCCI rules did not allow LM Insurance to reinstate the policy. But this argument of estoppel by means of a wrongful omission by LM Insurance is not alleged in the complaint, and it is inconsistent with the allegations of the complaint alleging that LM induced reliance by affirmatively misleading Advanced Welding with assurances that it would reinstate the policy. Doc. #15 at 5-6 (¶¶ 19-22).

Ultimately, the record does not support the existence of a genuine fact issue to show that LM Insurance made any statement or engaged in any act that was intended to or calculated to induce Advanced Welding to believe that LM Insurance would reinstate the policy. This precludes Advanced Welding's equitable estoppel claim.

## CONCLUSION

For the reasons set forth above, the Court GRANTS defendant LM Insurance Corporation's motion for summary judgment (Doc. #29) on plaintiff Advanced Welding LLC's claims for declaratory judgment and equitable estoppel. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 28th day of January 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge